## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **2:18-cr-00143-JDL** |
| | ) | |
| **MELQUAN JORDAN and** | ) | |
| | ) | |
| **EDWARD CANTY, III,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON DEFENDANTS' MOTION FOR A NEW TRIAL

On October 24, 2019, after a four-day trial, a jury found Melquan Jordan and Edward Canty III guilty of conspiring to distribute and possess with intent to distribute cocaine base and heroin.  In March of 2020, Canty filed a motion for a new trial (ECF No. 348), which Jordan joined (ECF No. 349), based on allegedly improper statements made by the prosecutor during the Government's opening statement, closing argument, and rebuttal.  For the following reasons, the motion for a new trial is denied as to both Jordan and Canty.

## I.  BACKGROUND

At trial, the Government asserted that Jordan, Canty, and others conspired to sell drugs in Maine which they had transported from New York.  The operation had two primary components.  The first was that the drug dealers in the conspiracy, including Jordan, Canty, and others, shared various residences in Portland from which they sold drugs.  These "traps" or "trap houses," as they are known, were primarily rented by drug users who allowed the dealers to operate out of them in

exchange for drugs.  The Government identified three primary trap houses in Portland that dealers cycled through.  The second component was that the dealers relied on various drug users to recruit customers or assist in the completion of drug sales.  A central figure was James Osborne, a drug user who was connected to the population of homeless people who use drugs in Portland.  To support its case, the Government called eight witnesses, including Osborne, most of whom were drug users and/or customers, some of whom rented the various trap houses.[1]

Before the close of evidence, Jordan and Canty's attorneys each made an oral motion for acquittal under Fed. R. Crim. P. 29(a), challenging the sufficiency of the evidence against Jordan and Canty.  I reserved decision on the motion, proceeded with the trial, and, at the trial's conclusion, submitted the case to the jury.  *See* Fed. R. Crim. P. 29(b).  The jury then returned guilty verdicts, finding that Jordan and Canty had each joined the conspiracy to distribute and possess with intent to distribute cocaine base and heroin.  The jury, however, attributed responsibility for different drug quantities to each Defendant, finding that Jordan's conduct involved 100 grams or more of a mixture containing heroin, while finding that Canty's conduct did not.

I then ordered the parties to file supplemental memoranda as to the motions for acquittal.  Following a review of the memoranda and a hearing on the motions, I

---

[1] Lamale Lawson, who was identified by several of the witnesses as a drug dealer working alongside Jordan and Canty, was called to testify by the Government, but he invoked his Fifth Amendment privilege and provided no testimony.  Additionally, one of the Government's witnesses was a special agent for the FBI and another was an officer with the South Portland Police Department who worked as an agent for the Maine Drug Enforcement Agency.

denied the motions in an oral decision announced from the bench on February 14, 2020.  Jordan and Canty then filed the present motion for a new trial under Fed. R. Crim. P. 33(a), contending that they were prejudiced by improper prosecutorial statements at trial.[2]

## II. STANDARD

Federal Rule of Criminal Procedure 33(a) provides that the "court may vacate any judgment and grant a new trial" if the defendant files a motion and "the interest of justice so requires."  "A district court has greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal."  *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986).  Still, a new trial is to be granted only "sparingly" and "only where there would be a miscarriage of justice."  *Id.* at 322 (internal quotation marks omitted) (quoting *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir. 1979)).  In conducting the analysis, "a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result."  *Id*.

Where a defendant has moved for a new trial based on a prosecutor's allegedly improper statements but did not timely object to the statements, review is for plain error.  *United States v. Peña-Santo*, 809 F.3d 686, 699 (1st Cir. 2015).  To demonstrate plain error, a defendant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4)

---

[2]  Although a motion for a new trial which is not based on newly discovered evidence must be submitted within fourteen days after the verdict, Fed. R. Crim. P. 33(b)(2), the Defendants moved for an extension of time, which I granted without opposition.  *See* Fed. R. Crim. P. 45(b)(1)(A).

seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Landry*, 631 F.3d 597, 606 (1st Cir. 2011) (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001)).  As to the third factor, a prosecutor's remarks affect a defendant's substantial rights if they resulted in prejudice to her or him. *United States v. Joyner*, 191 F.3d 47, 55 (1st Cir. 1999) (citing *United States v. Olano,* 507 U.S. 725, 732–34 (1993)).

Finally, "[b]efore granting a new trial based on a prosecutor's improper comments in a closing argument, a court must determine whether "the contested prosecutorial conduct 'so poisoned the well that the trial's outcome was likely affected.'" *United States v. Belanger*, 890 F.3d 13, 34 (1st Cir. 2018) (quoting *United States v. Henderson*, 320 F.3d 92, 107 (1st Cir. 2003)).  To make that determination, a court considers four non-exhaustive factors: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants."  *Landry*, 631 F.3d at 606 (*quoting United States v. Nelson-Rodriguez*, 319 F.3d 12, 38 (1st Cir. 2003)); *see also Belanger*, 890 F.3d at 34.

## III.  THE CHALLENGED PROSECUTORIAL STATEMENTS

Jordan and Canty contend that the prosecutor made several improper remarks to the jury during the Government's opening and closing remarks and rebuttal.  They argue that the prosecutor improperly:  (A) suggested that because other coconspirators had pled guilty and gone to jail it was now the Defendants' turn to go to jail; (B) vouched for the case and the credibility of the Government's witnesses; (C)

invoked social policy and appealed to the passions and prejudices of the jury; (D) referenced the Defendants by their aliases; (E) misstated the law of conspiracy; and (F) misstated trial testimony.

Determining whether a prosecutor's statement is improper is not always clear cut. The considerations are "numerous and work against easy rules of thumb." *United States v. Ayala-García*, 574 F.3d 5, 23 (1st Cir. 2009) (Boudin, J., concurring).

> [S]tatements may be improper for different reasons and in varying degrees; they may be fine in some contexts and not in others (*e.g.*, depending on the trial evidence); provocation or fair response may mitigate or excuse; corrective instructions may or may not be given and, if given, vary in their force; and judges also vary in what they think allowable comment.

*Id.* With this understanding, I turn to the statements that Jordan and Canty maintain were improper.

## A.   Suggesting that the Jury Should Convict the Defendants Because Other Coconspirators Had Pled Guilty and Gone to Jail

In their closing arguments, the Defendants' attorneys argued that the Government's witnesses were unreliable because, among other things, they had all received immunity from prosecution for charges that could be brought against them stemming from their testimony during the trial. In her rebuttal, the prosecutor stated the following:

> [Three of the four trap houses discussed in the trial] had renters in them whose places were taken over by these [D]efendants and their conspirators. The people who had those renting agreements did participate in this conspiracy, we allege. And they all went to jail. So we're here now to say it's [the Defendants'] turn.
>
> [The alleged coconspirators] went to jail. They didn't get a pass. They got immunity in this chair from their statements being used against

them in the event the federal government decided to charge them, too. But they stood in that courthouse and they pled guilty and they went to jail. Jaden Brown went to jail for 15 months. Jessica Tweedie went to jail for seven months. And Amy Santiago went to jail for seven to nine months . . . . They didn't get a pass. Jessica Tweedie was in jail while this guy and . . . this guy, Mr. Jordan, was trapping in Ms. Santiago's house, because they talked on the phone while Ms. Santiago and Mr. Osborne told you he was bagging up drugs at 11 Grant Street and welcoming customers all day long, while Jessica Tweedie is sitting in jail, we argue for Mr. Canty's drugs. None of those three women got a pass. They got protection from their statements being used against them here.

ECF No. 332 at 13-14.

Jordan and Canty contend that the prosecutor's statement that it was "their turn" to go to jail improperly suggested that they should be found guilty by association because witnesses, who were alleged coconspirators, had pled guilty and been sentenced to jail. They also assert that this argument misled the jury by wrongly conflating the relatively short state court sentences the witnesses had received with the far longer sentences the Defendants would face if convicted on federal charges.

In its opposition to the motion for a new trial, the Government does not substantively address whether this aspect of its rebuttal argument was proper, and instead argues that the challenged statements were not extensive, that the Court's jury instructions dissipated any prejudice, and that the weight of the evidence made the statements unlikely to have affected the trial's outcome.

"[A] defendant is entitled to have the question of his guilt determined upon the evidence against him, not on whether a codefendant or government witness has been convicted of the same charge." *United States v. Landrón-Class,* 696 F.3d 62, 70 (1st Cir. 2012) (quoting *United States v. Ofray-Campos,* 534 F.3d 1, 22–23 (1st Cir. 2008)).

In *Landrón-Class*, the defendant was tried and convicted for his role in a scheme to illegally obtain and distribute prescription drugs. *Id.* at 66. On cross-examination of the doctor involved in the scheme who had written the prescriptions, defense counsel asked about the benefits the doctor was receiving in exchange for testifying (i.e., being held responsible for only 745 medically unnecessary prescriptions, as opposed to the 20,000 the doctor had admitted to writing). *Id.* at 69–70. In response and over defense counsel's objection, the government asked the doctor if the doctor knew the status of the charges against his co-defendants in a separate criminal case, and the government elicited testimony that they had pleaded guilty. *Id.* The prosecutor referenced the guilty pleas again in closing arguments. *Id.* at 71.

The First Circuit explained that "[t]he government's attempt to suggest [a] sort of guilt-by-association [was] clear in its reminder to the jury during its closing argument" when the prosecutor stated, "[t]he doctor told you he was indicted with 21 other people, including pharmacists. So [the defendant] talks about how the prescriptions aren't properly marked. You know what? Those responsible for marking the prescriptions have already been dealt with." *Id.* The court concluded in *Landrón-Class* that, "[i]n light of the fact that the government had elicited testimony that [the doctor's] co-defendants had pled guilty, this argument was likely to appear as an attempt to suggest to the jury that, just as those individuals were held responsible, now it is [the defendant's] turn." *Id.*

The First Circuit has in limited circumstances, however, found similar statements proper. In *United States v. Foley*, the court examined whether it was

proper for the prosecutor to state in rebuttal that "it's time for [the defendant] to be held accountable by you," i.e., by the jury.  783 F.3d 7, 22 (1st Cir. 2015).  The court found the statements were proper, explaining that that the prosecutor is afforded more latitude in responding to statements made by defense counsel than in "statements made by the Government without provocation," and that the prosecutor's statement in context was responsive to the defendant's trial "strategy of shifting blame." *Id.* (quoting *United States v. Skerret-Ortega*, 529 F.3d 33, 40 (1st Cir. 2008)). The *Foley* court distinguished *Landrón-Class* by emphasizing that it was the prosecutor in *Landrón-Class* who had invited a guilt-by-association inference in the closing argument, whereas, in *Foley*, "it was [the defendant] who initially attempted to shift blame to [another individual] and to the [industry in which he operated], and the government's rebuttal merely responded to that argument."  *Id.* at 22 n.12. Accordingly, the propriety of the prosecutor's statement here that it was the Defendants' "turn" to go to jail hinges in part on whether it was responsive to arguments from defense counsel attempting to shift blame.  I conclude that it was not.

Defense counsel did in fact challenge the credibility of the Governments' witnesses by highlighting that they had received lenient treatment by the Government as evidenced by the absence of federal prosecution and by immunity agreements with the Government. However, the defense attorneys' arguments did not try to shift the blame onto those witnesses.  Counsel for Jordan argued that the prosecutor had been "calling all of these folks conspirators, and I submit to you that

we're throwing that conclusion around really too fast and loose," because several of the witnesses were "not charged with a federal conspiracy and won't be, because you've seen all of their letters of immunity."  Trial Tr., Defs.' Summation at 1.  He stated that several witnesses were "get[ting] a pass" and receiving various benefits from the Government.  *Id.* at 2 ("Jaden Brown gets a pass first from the exploitation and suffering she's caused."), 2–3 ("35,000 [dollars] or so for rehab, coddled by FBI agents so that . . . he doesn't hurt himself with his serious drug habit . . . , what more can the U.S. Government do for James Osborne? . . . James Osborne does not get charged with federal conspiracy; he does not get charged at all with all of his trafficking or possession."), 3–4 ("But after she meets with the Government's team, . . . she gets out of jail, benefit number I've lost count . . . .  In Miss Tweedie's case the minimum was four years [in prison].  Miss Tweedie gets a pass there, and of course everything she discussed here in this room is immunized."), 4–5 ("Amy Santiago runs or owns the Grant Street apartment, and she comes in here and mentions all of her dealings over years and no other charges for her."), 6 ("Tanya Johnson's case.  The charge disappeared.  Not dismissed, never moved forward at all.").  In context, the point of defense counsel's argument was not that the prosecutor should have charged these witnesses instead of Jordan or Canty because they were more blameworthy, but that, as Jordan's attorney argued, the witnesses' "credibility is in massive doubt." *Id.* at 3.

A prosecutor is afforded some leeway in responding to a defense theory that "cooperating witnesses were lying to obtain leniency."  *United States v. Martínez-*

*Medina*, 279 F.3d 105, 119 (1st Cir. 2002); *see also United States v. Perez-Ruiz*, 353 F.3d 1, 10 (1st Cir. 2003) ("We typically cede prosecutors some latitude in responding to defense counsel's allegations of fabrication.").   Accordingly, in this case the prosecuting attorney was certainly justified in arguing that several of the cooperating witnesses had faced punishment in response to defense counsel's contention that the witnesses were "getting a pass" in exchange for their testimony.   But the Defendants' leniency argument does not countenance the prosecutor's contention that because several cooperating witnesses had pleaded guilty and gone to jail, it was now the Defendants' "turn."   This argument improperly urged the jury to find Jordan and Canty guilty by association with those who had previously pleaded guilty.   The prosecutor's argument was more explicit than the argument considered in *Landrón-Class* and, therefore, was more egregious.   It also improperly suggested to the jurors that it was their duty to not only determine the Defendant's guilt or innocence, but to also determine whether the Defendants should go to jail.   For these reasons, the argument was highly improper and necessarily prejudiced the Defendants' right to a fair trial.

## B.   Improper Vouching

In her rebuttal argument, the prosecutor also elaborated on the role she and the prosecution team had played in developing the case, which Jordan and Canty challenge as improper vouching.   In responding, in part, to arguments by the Defendants' attorneys that the Government had failed to introduce evidence that their clients were involved in the sale of crack cocaine as well as heroin (as suggested by the indictment), the prosecutor stated:

And it depends on which drug we're talking about.

And I do want to address that really quickly, and I'll try to stay on topic here. But our job we take very seriously. It is to prove to you that there was a conspiracy. The conspiracy that these very hard-working agents after three years found existed involved crack cocaine and heroin. Some of the people involved in the conspiracy only dealt with heroin. They're sitting here before you. Some of them dealt with crack cocaine. . . . The conspiracy involved both drugs. . . . It was a conspiracy involving these two drugs. But they don't both -- they don't have to have dealt with both drugs for you to find them guilty. . . .

. . . .

And with all due respect to [counsel for Canty], these agents did three years of work, and it is evident in the exhibits that you saw. Those grand jury transcripts they waved around were hundreds of pages long.[3] We didn't just throw people up there that we met. . . .

We didn't charge the people who are just users. We charged conspirators, some of whom you met and some of whom you didn't. And [the judge] will tell you that it is not your concern who should have been charged. It is not your concern what happened to the other people in the conspiracy, who was charged and who wasn't, what they were charged with. Your only concern is whether we have proven beyond a reasonable doubt that these two men committed the crime we say they did. . . .

. . . .

I feel like this is said way too often but it is true. The Government would very much love to call angels to the stand 100 percent of the time, with no criminal history and no drama and no mental health issues and no substance abuse. But those are not the people that bought drugs from Melquan Jordan and Edward Canty. So the people that we called are the people that they associated with in 2015 and '16. We called the witnesses who are the only people who know what they were doing, and they were banking on you not believing those people.

So we spent three years carefully talking to those people. So to say there's been no law enforcement work is unfair, because this case has revealed that these agents spent time with people. They showed compassion for people who had problems, they spent time with them,

---

[3] Defense counsel brought the grand jury transcripts up to the podium and held them during his summation.

and they made sure that there was corroborative evidence for their stories. And we put up there on the stand the people that I suggest to you told compelling and believable and reliable stories. They are all very messy individuals by themselves. But collectively I suggest to you they have presented beyond a reasonable doubt evidence.

Not one person involved in this case who provided testimony told you that they did one drug deal with these men. We didn't rely on people who said they did one drug deal; we didn't put one-time customers in that chair. We put conspirators in that chair. We put people who actually engaged in this conspiracy with those men in that chair. And we made sure that we presented to you evidence involving people who regularly and repeatedly purchased drugs or sold drugs from these two men.

. . . Your job is to decide that as you sat here so carefully and engaged -- and we watched, you all have listened so carefully to the stories that these people told, and I suggest to you they were compelling stories and that collectively they tell a story that supports the verdict in this case.

And it will be up to you to decide the very important decision of whether you believe them . . . .

ECF No. 332 at 14-17, 20-21.

Although it is "generally permissible for the government to offer specific 'reasons why a witness ought to be accepted as truthful by the jury,'" *United States v. Vázquez-Larrauri*, 778 F.3d 276, 283 (1st Cir. 2015) (quoting *United States v. Rodríguez,* 215 F.3d 110, 123 (1st Cir. 2000)), a prosecutor may not personally vouch for the credibility of witnesses, *id.* at 284. Improper vouching may "tilt the scales of justice, risk prejudicing the defendant, and carry the potential for distracting the jury from its assigned task of assessing credibility based solely on the evidence presented at trial and the demeanor of the witnesses." *Perez-Ruiz*, 353 F.3d at 9–10.

Credibility arguments can take "several forms" that "plainly cross over into improper vouching." *Vázquez-Larrauri*, 778 F.3d at 284.

> The first form occurs when the prosecutor tells the jury that the prosecutor takes personal responsibility or ownership of the case and thus directly places the government's credibility at issue. The second form of prohibited vouching occurs when the prosecutor imparts her personal belief in a witness's veracity. Bare assertions that a witness was honest or correct are therefore improper.

*Id.* (alteration, quotation marks, and internal citations omitted). That said, the First Circuit has explained that "some leeway is appropriate when the government's challenged comments may fairly be seen as a response to comparable remarks by defense counsel." *Ayala-García*, 574 F.3d at 18 (collecting cases); *see also Henderson*, 320 F.3d at 107 ("Under the invited response rule, if the prosecutor's remarks were 'invited,' and 'did no more than respond substantially in order to right the scale,' such comments do not warrant reversal.") (quoting *United States v. Nickens,* 955 F.2d 112, 122 (1st Cir. 1992)). "The latitude afforded prosecutors is not, however, boundless," *Ayala-García*, 574 F.3d at 18, and courts have placed limits on the extent to which a prosecutor may attempt "fighting fire with fire," *id.* (quoting *United States v. Sepúlveda*, 15 F.3d 1161, 1189 n.24 (1st Cir. 1993)).

Here, the prosecutor's statements were made in response to arguments by both defense attorneys that the Government had charged the Defendants with conspiracy to distribute and possess with intent to distribute both heroin and cocaine base, but had failed to produce any evidence of crack cocaine. Trial Tr., Defs.' Summation at 14 ("The two people that you've heard . . . this week who know and dealt with [Jordan] the most were James Osborne and Jessica Tweedie. Both of them told you, no crack."),

13

27 ("Well, I'm wondering where's the evidence of crack cocaine, cocaine base, that Eddie Canty is supposedly involved with.  Because I didn't hear it."), 28 ("But this conspiracy is cocaine base and heroin, and there's no cocaine base involved with anybody's testimony involving Eddie Canty, none.")  The prosecutor's statements were also responsive to the argument by Canty's attorney that the evidence developed by the police "didn't add a thing."[4]  Trial Tr., Defs.' Summation at 35.

Against this backdrop, several of the prosecutor's statements were properly responsive to the arguments made by the Defendants' attorneys. In context, the

---

Canty's attorney argued:

> But I agree with [counsel for Jordan], spare me the pain and the suffering of the people that were actually trafficking in these drugs and they come in and they want to tell you about their suffering.  That's their choices that they make.  We're responsible for our choices, and the Government is responsible for a choice of bringing a conspiracy charge against Eddie Canty for heroin and cocaine base without any sufficient evidence that he was involved in any such thing without any agreement other than the fact that he knows Akeem Cruz and came up here and [was] hanging around with him. . . .

> . . . .

> . . . The Government's got a lot of sway, got a lot of power, got a lot of cache.  But they're not always right.  They brought a conspiracy charge that they've got no quality evidence to back up.  You heard the witnesses that they're relying on.  You have your own opinion about them.  You're not going to accept my opinion.  If I was telling you some things about how I felt about the evidence and -- or how I see the evidence going and you didn't agree with me, you'd say, too bad, I don't agree with you.  But I'm suggesting that it's very possible and it's likely that you do agree, that you saw those witnesses, you know you cannot base a criminal conviction of serious conspiracy charge in federal court on that type of evidence.

> Police didn't add a thing.  They do a great job.  They were watching people coming and going.  They busted Santiago; before that they busted Jessica Tweedie.  They busted the people that were doing the trafficking. They watched my client, Eddie Canty, drive -- get driven by Tanya Johnson from where he was -- parked his car over to another neighborhood.  That's the extent of the police involvement and the police evidence against Eddie Canty.

Trial Tr., Defs.' Summation at 33–36.

prosecutor was trying to explain that the jury could convict the Defendants of a *conspiracy* to distribute two drugs, even if the Defendants themselves only directly sold one of the two drugs.  She was also properly noting that although several of the witnesses lived troubled and difficult lives, their testimony was corroborated and should be believed.   Nevertheless, for reasons I will explain, the prosecutor's statement went too far in vouching in several respects.

A prosecutor's statements constitute improper vouching when they "invite the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence," *United States v. Torres-Galindo*, 206 F.3d 136, 142 (1st Cir. 2000), or when they "indicate that facts outside the jury's cognizance support the testimony of the government's witnesses," *United States v. Auch*, 187 F.3d 125, 131 (1st Cir. 1999) (citing *United States v. Neal,* 36 F.3d 1190, 1207 (1st Cir. 1994)). Here, the prosecutor stated that "very hard-working agents after three years" had "found [a conspiracy] existed involv[ing] crack cocaine and heroin."  ECF No. 332 at 15.  Although this statement was a springboard to argue that Jordan and Canty "only dealt with heroin" while others in the conspiracy dealt with cocaine base, the prosecutor then repeatedly emphasized that the "agents did three years of work"; that that work was "evident in the exhibits that you saw"; that the Government "didn't just throw people" on the witness stand; that "we spent three years carefully talking to those people"; that the agents "showed compassion for people who had problems, . . . spent time with them, and . . . made sure that there was corroborative evidence for their stories"; and that "[w]e didn't charge the people who are just users.  We charged

conspirators, some of whom you met and some of whom you didn't."  ECF No. 332 at 15-16, 20.

These statements went beyond explaining the Government's theory of the case. They suggested that the prosecutor and government agents—i.e., "we"—should be trusted based on the care they had taken in investigating the case and marshaling the evidence, thus invoking the prosecutor's own prestige in support of the trustworthiness of the Government's evidence.  *See, e.g., Landry*, 631 F.3d at 606 (holding that prosecutor's reference to getting "the right person" to act as the Government's expert witnesses was improper and that "statements regarding the time and expense in procuring those expert witnesses were plainly irrelevant"); *see also Joyner*, 191 F.3d at 55 (noting that the government conceded as improper "the prosecutor's statements that the government does not just 'round up as many people as we possibly can to point the finger at [the defendant] and just run in here and expect you to buy it'").  In short, the prosecutor's rebuttal argument that, in effect, she and the agents had corroborated the statements of the government witnesses and had determined that there was a conspiracy, improperly "invite[d] the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence."  *Torres-Galindo*, 206 F.3d at 142.  Accordingly, the prosecutor's argument constituted improper vouching.

## C.   Appeals to Passion and Prejudice

Jordan and Canty assert that the prosecutor improperly invoked "social policy" and appealed to passion and prejudice in several ways during her opening statement,

closing argument and rebuttal—namely, by asking the jury to be the conscience of the community, injecting racial animus into the trial, and improperly referencing a video of Jordan applying a tourniquet to James Osborne as Osborne injected heroin. ECF No. 348 at 1, 2.[5]

### 1. Jury as the Conscience of the Community

At the outset of her opening statement, the prosecutor stated:

> As long as greed is stronger than compassion, there will always be suffering.  This case, ladies and gentlemen, is about the greed of a group of young men from the area of Brooklyn, New York, who came here to make easy money selling illegal drugs and the suffering of many Mainers whose addictions helped make those men money.

ECF No. 331 at 2.  The prosecutor echoed these words at the start of her closing argument:

> [T]his is about the business of drugs, a business of a group of young men from Brooklyn, New York, who came to Maine to exploit drug-addicted people to help themselves make money, to exploit individuals who are addicted to drugs that cause suffering, suffering inside their bodies.  You had an opportunity to hear from a number of witnesses who talked to you about how these drugs that they took affected them and what suffering can come from those drugs if they don't continue to use them, the suffering of drug-addicted individuals who between 2015 and 2017 used both cocaine base, crack cocaine, and heroin in the greater Portland area for that first time to get high and then every time after that just to not get sick, addicts like James Osborne, Jaden Brown, Amy Santiago, and Tanya Johnson.

---

[5]  Canty also argues that he was prejudiced by the introduction of evidence regarding Jordan's sexual relationships with two of the witnesses, both white women, along with the introduction of a murder of one of Jordan's associates that occurred a decade before the trial.  ECF No. 348 at 1.  However, he makes no legal argument as to why the introduction of this evidence was improper, and the record does not reveal that he objected to the evidence at trial.  In addition, the prosecutor made no mention of these relationships in her closing or rebuttal arguments.  Accordingly, I do not address these arguments further.

ECF No. 332 at 2.   And she made similar comments throughout her rebuttal, emphasizing that the conspiracy relied on drug-dependent go-betweens who acted as liaisons between drug dealers and buyers:

> I suggest to you that this is an ingenious model for drug trafficking. . . . [Y]ou find a go between.  You find someone who needs it because they will get physically sick.  They will vomit; they will have diarrhea; they will get headaches; they will be physically miserable if they don't get that needle in their arm or they don't smoke the pipe. . . .
>
> . . . .
>
> . . . [T]he common thread through each of these people was that they were exploited by these two [D]efendants and other people involved in this conspiracy whose goal was to take the very thing that made them so vulnerable and take advantage and make money, whether it was to try a new strain of heroin or live out in the street if you were going to get sick, if you couldn't come in.  And they were – sure, they'd help you put a tourniquet on your arm if it meant you were going to get what you needed so that you could go back out and make another deal.

*Id.* at 14, 22.

A prosecutor is not barred from stating the government's theory of the case, but she may not make "unfair statements."  *United States v. Carpenter*, 736 F.3d 619, 627 (1st Cir. 2013).  The First Circuit has explained that "it is improper to appeal to the 'jury's emotions and role as the conscience of the community.'"  *United States v. Avilés-Colón*, 536 F.3d 1, 24 (1st Cir. 2008) (quoting *Martínez–Medina,* 279 F.3d at 119).  It is also improper for a prosecutor to address "drug trafficking . . . as social malaise."  *United States v. Vázquez-Rivera*, 407 F.3d 476, 485 (1st Cir. 2005).  A prosecutor may, however, focus the jury on a defendant's profit motive when it "directly relate[s] to the government's burden of showing intent."  *Carpenter*, 736 F.3d at 629.

Here, the prosecutor's statements went beyond the Defendants' profit motive by ascribing a callousness to them based on, as the prosecutor argued, "the suffering of many Mainers whose addictions helped make those men money."  ECF No. 331 at 2.  The prosecutor's emphasis on the impact of drugs on "Maine," "many Mainers," and "the greater Portland area" improperly called on the jury to consider the impact of drugs on their community.  In *Avilés-Colón*, the First Circuit concluded that it was improper for a prosecutor to describe the case as "about drugs and violence that we read about in the newspaper every[ ]day and we hear about on the television when we go home at night; the same violence which occurs in Puerto Rico on a daily basis and which takes the lives of hundreds of young people each year."  536 F.3d at 24;  *see also United States v. Machor*, 879 F.2d 945, 956 (1st Cir. 1989) (finding it "improper" for prosecutor to state that "drugs are poisoning our community and our kids die because of this" (alteration omitted)).  Although the prosecutor's appeal in this case was more nuanced and, therefore, less direct than that in *Avilés-Colón,* it was nonetheless improper because it appealed to the jury to act as the conscience of the community and to punish the Defendants for their greed.

### 2.  Racial Animus

Jordan and Canty also argue that the prosecutor's repeated references to the Defendants as having come from Brooklyn, New York in her opening statement and closing argument inappropriately injected a racial element into the case and/or pitted the Maine jury against them by casting them as outsiders.  They emphasize that they

were two Black men tried before an all-White jury.[6]  The prosecutor's opening

statement began:

> As long as greed is stronger than compassion, there will always
> be suffering. This case, ladies and gentlemen, is about the greed of a
> group of young men from the area of Brooklyn, New York, who came
> here to make easy money selling illegal drugs and the suffering of many
> Mainers whose addictions helped make those men money.

ECF No. 331 at 2.  Her closing argument began with the same theme:

> Ladies and gentlemen, as I told you during my opening, this is
> about the business of drugs, a business of a group of young men from
> Brooklyn, New York, who came to Maine to exploit drug-addicted people
> to help themselves make money, to exploit individuals who are addicted
> to drugs that cause suffering, suffering inside their bodies.

ECF No. 332 at 2.

When a defendant fails to object at trial, courts are "not inclined to find

improper meaning in a prosecutor's statement if there is a plausible alternative," as

is the case here.  *United States v. Rodriguez*, 675 F.3d 48, 65 (1st Cir. 2012) (collecting

cases).  The First Circuit has firmly established that a prosecutor is "entitled to point

out that the drugs used in [an] alleged conspiracy were, in fact, from" a particular

location where there is an evidentiary basis for saying so.  *United States v. Lopez

Garcia*, 672 F.3d 58, 64 (1st Cir. 2012) (Souter, J.) (explaining that it was "difficult to

see how reference to the [conspiracy's] Mexican association was likely to add anything

to what generally informed jurors would know in any event, that high level drug trade

is typically violent and that a lot of drugs come north from Mexico"); *United States v.*

---

[6]  This is not an unusual circumstance for Black defendants tried in Maine, where 94.4% of the
population identify as white. *See QuickFacts: Maine; United States*, United States Census Bureau,
https://www.census.gov/quickfacts/fact/table/ME,US/IPE120219 (last visited October 6, 2020).

*Ovalle-Marquez*, 36 F.3d 212, 220-21 (1st Cir. 1994) (concluding that it was not improper for a prosecutor to argue in closing that a drug conspiracy had Colombian ties when testimony regarding the Colombian origin of the drugs had been properly admitted at trial and the remarks therefore served a purpose beyond simply "inflam[ing] the passions and prejudices of the jury").

However, the First Circuit has also noted that, "[d]ue to the singular importance of keeping our criminal justice system on an even keel, respecting the rights of all persons, courts must not tolerate prosecutors' efforts gratuitously to inject issues like race and ethnicity into criminal trials." *United States v. Saccoccia*, 58 F.3d 754, 774 (1st Cir. 1995).  Accordingly, "[i]n determining the propriety of evidence implicating ethnicity or national origin, context is critical." *Id.* at 775.

Here, the trial evidence established that Jordan and Canty had each come from Brooklyn, New York to Maine, and had returned to New York to obtain additional drugs to sell in Maine.  The prosecutor's references to Jordan and Canty's Brooklyn, New York ties were supported by evidence and were not disputed at trial.  In addition, the conspiracy's business model of relying on drug-addicted people in Maine to assist the dealers was also consistent with the trial evidence. Viewed in context, the prosecutor's arguments, which were not objected to, accurately described the origins and nature of the conspiracy and were not a gratuitous effort to inject issues of race into the trial.

### 3. Tourniquet Video Evidence

Jordan and Canty challenge the prosecutor's argument, made at the end of her rebuttal, that "they'd help you put a tourniquet on your arm if it meant you were going to get what you needed so that you could go back out and make another deal." ECF No. 332 at 22.  The entire relevant portion of the argument was as follows:

> And it will be up to you to decide the very important decision of whether you believe them, whether you believe that the common thread through each of these people was that they were exploited by these two [D]efendants and other people involved in this conspiracy whose goal was to take the very thing that made them so vulnerable and take advantage and make money, whether it was to try a new strain of heroin or live out on the street if you were going to get sick, if you couldn't come in. *And they were -- sure, they'd help you put a tourniquet on your arm if it meant that you were going to get what you needed so that you could go back out and make another deal.* And then, if the police come knocking, you walk away, you disappear, just disappear, and everyone that's left goes to jail, sitting on your drugs.

ECF No. 332 at 21-22 (emphasis added).

This argument referred to a videotape that had been posted on social media which depicted Jordan applying a tourniquet to James Osborne as Osborne injected heroin in the presence of other coconspirators.  Canty was not present and is not seen in the video.  The Government stipulated when it sought to admit the videotape into evidence that the events it depicted took place after Canty had left Maine and was no longer a participant in the conspiracy.  The jury was instructed to consider the evidence only in connection with the Government's case against Jordan, and not in connection with the Government's case against Canty.

Against this backdrop, the prosecutor's argument that "they'd help you put a tourniquet on your arm," made at the very end of her rebuttal argument, without

identifying who "they" were—i.e., Jordan and other individuals, but not Canty—was, as to Canty, unsupported and inflammatory.  Because this argument was contrary to the evidence and the Court's earlier instruction to the jury, it was improper.

## D.  Referring to the Defendants by Their Aliases

Both Defendants used aliases which the other individuals connected to their drug sales knew them by.  Jordan was known as "Squirrel," and Canty was known as both "Demo" and "Debo."  Jordan and Canty now argue that the prosecutor's reference to them in summation by these aliases demonstrated the Government's contempt for the Defendants and was unfairly prejudicial.

As discussed earlier, when a defendant fails to object at trial, the court is "not inclined to find improper meaning in a prosecutor's statement if there is a plausible alternative."  *Rodriguez*, 675 F.3d at 65.  "It has long been the law in [the First] Circuit that introduction of alias evidence at trial is proper where it is relevant and does not prejudice a defendant."  *United States v. Doe*, 741 F.3d 217, 227 (1st Cir. 2013) (citing *United States v. Candelaria-Silva,* 166 F.3d 19, 33 (1st Cir. 1999)).

The First Circuit has explained that "reference to . . . defendants as animals is especially inflammatory and improper" where, for example, the prosecutor characterized the defendants as "hunting each other like animals" and killing one another "with no mercy."  *Martínez-Medina*, 279 F.3d at 119.  But that is not what occurred here.  Even though Jordan's alias—"Squirrel"—was a type of animal (and an individual associated with Jordan who was mentioned during the trial went by the name "Animal"), the prosecutor's use of these aliases was a far cry from the

prosecutor's dehumanizing reference to the defendants as "animals" in *Martínez-Medina*. In this case, several witnesses knew the Defendants primarily by their aliases, and thus the prosecutor's reference to the aliases was proper since it was "necessary to connect the defendants with the acts charged." *Doe*, 741 F.3d at 227 (quoting *United States v. Hines*, 995 F.2d 1449, 1454 (11th Cir. 1992)).

## E.    Misstating the Law of Conspiracy

"To prove the elements of the crime of conspiracy, the Government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." *United States v. Rodriguez-Marrero*, 390 F.3d 1, 12 (1st Cir. 2004) (quoting *United States v. Llinas,* 373 F.3d 26, 30 (1st Cir. 2004)). Jordan and Canty argue that the prosecutor provided a "flagrantly misleading" definition of conspiracy law to the jury when she stated that "to be part of a conspiracy you don't have to know each other and you don't have to know what the other person is doing, but you do have to know what at least one other person in that conspiracy is doing." ECF No. 348 at 6 n.1 (citing ECF No. 332 at 6). The prosecutor made this statement as part of her discussion of Jordan and Canty's differing levels of involvement in the alleged conspiracy.

Jordan and Canty did not object during the prosecutor's summation, and they do not explain what was improper about her statement. "It is hornbook law that a defendant may be found guilty of participating in a drug-trafficking conspiracy without knowing the full extent of the enterprise or the identities of all the coconspirators." *United States v. Ortiz de Jesus*, 230 F.3d 1, 5 (1st Cir. 2000) (citing

*United States v. Rivera-Santiago*, 872 F.2d 1073, 1079 (1st Cir. 1989)).  Moreover, "each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." *United States v. Cortés-Cabán*, 691 F.3d 1, 13–14 (1st Cir. 2012) (quoting *Martínez–Medina*, 279 F.3d at 113).  Accordingly, the prosecutor did not misstate the law.

To the extent the prosecutor's statement of the law could have been clearer or more complete, the Court provided a thorough definition of conspiracy law as part of the final jury instructions.  *Final Jury Instructions* at 5–6.  The law in this circuit "assumes that jurors follow jury instructions and thus that they followed the judge's, not counsel's, definition." *Belanger*, 890 F.3d at 35 (quoting *United States v. Gonzalez-Gonzalez*, 136 F.3d 6, 9 (1st Cir. 1998)).  Therefore, any deficiencies in the prosecutor's statement of the law were addressed by the Court's jury instructions on conspiracy law.

## F.   Misstating Trial Testimony

Jordan and Canty also argue that the prosecutor misstated some of the evidence.  In particular, Jordan and Canty argue that the prosecutor exaggerated the amount of drugs that one of the witnesses, Tanya Johnson, purchased from Canty.  The prosecutor stated:

> The only person we met most recently was Tanya Johnson because she was listed as a [confidential informant] in a search warrant, because she is the person who stumbled into Mr. Canty's drug trafficking.  And when we looked at the number of contacts between them, we call her up, we fly her up, do you know him?  Yeah, I know him, that's Debo or that's Mr. Canty.  Did you buy drugs from Debo?  Yeah, I did.  How many times?

> *Too many to count.*  But you just bought drugs from him?  No, I drove
> him.  That's a conspirator, ladies and gentlemen.  She's participating;
> she's helping further and promote the conspiracy.  She isn't just an
> addict who's using their product.

ECF No. 332 at 16 (emphasis added).   Jordan and Canty cite to Johnson's trial

testimony, in which Johnson testified that she had fewer than five face-to-face

interactions with Canty.  ECF No. 348 at 6 n.1 (citing ECF No. 292 at 39); *see also*

ECF No. 292 at 45.   But Johnson also testified that she bought heroin from Jessica

Tweedie on "[a] lot" of occasions, and that Canty was Tweedie's supplier.  ECF No.

292 at 46, 49.  Thus, the prosecutor's characterization of the frequency of Johnson's

drug purchases from Canty was not supported by the trial evidence, but, when

considered in conjunction with the evidence of Johnson's indirect purchases of drugs

from Canty through Tweedie, had some support.   Accordingly, I conclude that the

argument, although an exaggeration of the trial evidence, does not rise to the level of

an obvious error.[7]  *See Vázquez-Larrauri*, 778 F.3d at 288.

## IV.  PLAIN ERROR REVIEW

"[A] criminal defendant who believes that a prosecutor's closing argument goes

too far must usually object to the offending statements when and as they are uttered."

*Sepúlveda*, 15 F.3d at 1186 (citing *Arrieta-Agressot v. United States,* 3 F.3d 525, 528

(1st Cir. 1993)).   Doing so provides the prosecutor an opportunity to "clarify

---

[7] Further, any potential prejudice was minimal.  The misstatement, to the extent there was one, occurred only once, without any indication of deliberateness from the prosecutor, and the court's instructions made clear to the jury, at the beginning and end of trial, that statements by counsel were not evidence.  *See United States v. Madsen*, 809 F.3d 712, 717 (1st Cir. 2016) (noting that a plain error assessment of a prosecutor's misstatement requires the court to consider "the frequency and deliberateness of the prosecutor's comments, the strength and clarity of the trial judge's instructions, and the strength of the government's case against the defendant") (quoting *United States v. Morales-Cartagena*, 987 F.2d 849, 854 (1st Cir. 193)).

ambiguities and correct mislocutions in a timely manner" and allows the trial judge, if necessary, to "administer an immediate antidote, thereby curtailing any damage." *Id.* (citing *Arrieta-Agressot*, 3 F.3d at 528). Because Jordan and Canty did not object to any of the statements during trial that they now assert are improper, that opportunity was lost, and the statements are judged against a more demanding standard of scrutiny—plain error—than if they had been timely objected to. *Peña-Santo*, 809 F.3d at 699 (citing *United States v. González-Pérez*, 778 F.3d 3, 19 (1st Cir. 2015), and *Rodriguez*, 675 F.3d at 64); *see also* Fed. R. Crim. P. 52(b).

As explained earlier, to demonstrate plain error, a defendant must show (1) that an error occurred; (2) which was clear or obvious; (3) which prejudiced the defendant; and (4) which seriously impaired the fairness, integrity, or public reputation of judicial proceedings. *Belanger*, 890 F.3d at 34. Plain error poses a "difficult hurdle to vault" because it "exists to correct 'blockbusters,' not 'the ordinary backfires . . . which may mar a trial record.'" *Madsen*, 809 F.3d at 717 (alteration in original) (quoting *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir. 1987)). The standard is steep, but not insurmountable. "[E]xcessive summations may on rare occasions constitute plain error . . . ." *Sepúlveda*, 15 F.3d at 1186.

For the reasons I have explained, the prosecutor engaged in four improper arguments. First, she suggested that the jury should convict the Defendants because alleged coconspirators had gone to jail and it was now the Defendants' turn. Second, she improperly vouched for the hard work and good intentions of the investigating agents, and invoked the prestige of her own office by referring to the agents and

herself collectively as "we" in describing the efforts made to corroborate the evidence and prove the case. Third, she urged the jury to act as the conscience of the community. And finally, as to Canty, the prosecutor improperly argued that both Defendants would "put a tourniquet on your arm if it meant you were going to get what you needed so that you could go back out and make another deal" when the jury had been directed not to consider the video depicting the tourniquet incident in the Government's case against Canty.

Each of the improper arguments were erroneous and obvious, thus satisfying the first two elements of the clear error analysis. The prosecutor's argument that it was the Defendants' turn to go to jail was plainly prejudicial because it was so fundamentally at odds with the presumption of innocence. Additionally, the improper vouching,[8] invocation of the jury as the conscience of the community,[9] and, as to Canty, the tourniquet evidence argument, considered together, were unfairly

---

[8] Regarding the prosecutor's improper vouching, the First Circuit recognizes certain types of vouching as more prejudicial than others: "[I]t is likely to be more dangerous where the prosecutor flaunts the government's skills and purity of motive or where the context or the prosecutor's words imply private knowledge of the defendant's guilt that unfortunately cannot be shared with the jury." *United States v. Vizcarrondo-Casanova*, 763 F.3d 89, 97 (1st Cir. 2014) (quoting *United States v. Gomes,* 642 F.3d 43, 47 (1st Cir. 2011)). Here, the prosecutor did "flaunt[]" the agents' skills and purity of motives, *id.*, but only briefly and in reaction to the Defendants' argument challenging the sufficiency of the investigation. Her words did not imply the existence of private knowledge of evidence supporting the Defendants' guilt. However, while not highly prejudicial on its own, it added to the overall unfairly prejudicial nature of the prosecutor's statements.

[9] As to the prosecutor's invocation of the jury as the conscience of the community, it is unlikely that the prosecutor's comments were prejudicial to the Defendants on their own, as they were relatively nuanced and indirect. *See Avilés-Colón*, 536 F.3d at 24 (noting that the prosecutor's comments linking the Defendants' conduct to the problems of drugs and violence in Puerto Rico generally were unlikely to have prejudiced the outcome of the trial). However, similar to the prosecutor's improper vouching, the comments added to the prejudicial nature of the prosecutor's statements as a whole.

prejudicial to the Defendants, thus satisfying the third element of the clear error analysis.

Under the plain error standard, the analysis does not end here.  Plain error review requires me to next examine the fourth element: that the errors not only prejudiced the Defendants but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings.  In so doing, I consider whether the prosecutor's conduct "so poisoned the well that the trial's outcome was likely affected," an inquiry which involves consideration of the severity of the prosecutor's misconduct, its context, the presence and likely effect of any curative instructions given by the court, and the strength of the evidence against the Defendants.  *Belanger*, 890 F.3d at 34 (quoting  *Henderson*, 320 F.3d at 107, and citing *United States v. Wihbey*, 75 F.3d 761, 722 (1st Cir. 1996)).  I turn to consider (1) the severity of the prosecutor's misconduct and the likely curative effect of the Court's instructions, and (2) the strength of the evidence against each Defendant.

## A.  Severity of the Prosecutor's Misconduct and the Likely Curative Effect of the Court's Instructions

The prosecutor's contention that it was the Defendants' "turn" to go to jail suggested their guilt by association and thus presented a substantial risk of prejudicing the Defendants' right to a fair trial.  The prosecutor's vouching for the strength of the Government's case and invocation of the jury as the conscience of the community also may have contributed to prejudice against the defendants.  However, the prejudicial effect of these missteps, though serious, was likely mitigated by the

Court's instructions that followed soon thereafter.  Among other things, the jury was instructed:

> You must not be influenced by any personal likes or dislikes, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you and according to the law. You will recall that you took an oath promising to do so at the beginning of the case.

*Final Jury Instructions* at 1.  Second:

> The evidence from which you are to decide what the facts are consists of sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness; the exhibits that have been received into evidence; and any facts to which the lawyers have agreed or stipulated.

*Id.* at 2.  Finally:

> Certain things are not evidence. . . . Arguments and statements by lawyers are not evidence. The lawyers are not witnesses.  What they say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them from the evidence differ from the way the lawyers have stated them, your memory of them controls.

*Id.* at 3.

With regard to the prosecutor's improper association of Canty with the video depicting Jordan applying a tourniquet to Osborne, the resulting prejudice was mitigated by the court's instruction to the jury that that video evidence was received only in connection with the Government's case against Jordan, and not against Canty. ECF No. 288 at 116.  In addition, the Court's final jury instructions reiterated that evidence received for a limited purpose could only be considered for that purpose.[10]

---

[10]  The jury was instructed that evidence received for a limited purpose "can be used by you only for one particular purpose, and not for any other purpose.  I have told you when that occurred, and

Final jury instructions given by a trial judge can dissipate prejudice that otherwise might constitute plain error, although such a result is not automatic:

> In most of the cases in which a standard corrective instruction was held sufficient to dissipate all prejudice, there was "overwhelming evidence of [the defendant's] guilt, which 'eliminate[d] any lingering doubt that the remarks could have unfairly prejudiced the jury's deliberations.'" *Joyner,* 191 F.3d at 54.   In other cases, the misstatements were peripheral to the defense.  *See United States v. Bey,* 188 F.3d 1, 8 (1st Cir. 1999) (finding that the prosecutor's misstatements were irrelevant to Bey's theory that he was "an innocent dupe"); *see also United States v. Lowe,* 145 F.3d 45, 48, 50 (1st Cir. 1998) (affirming a conviction where there was ample evidence supporting the verdict and the misstatement apparently was not central to the defense).

> Other cases hold that where the evidence was close, and the misstatement goes to a central issue in the case, an instruction to consider the evidence may well be insufficient.

*United States v. Azubike*, 504 F.3d 30, 41–42 (1st Cir. 2007) (alterations in original) (footnote omitted).   I thus turn to consider a "crucial factor" of the analysis: "the weight of the evidence of the defendants' guilt or innocence."  *Arrieta-Agressot*, 3 F.3d at 528 (citing *United States v. Santana-Camacho,* 833 F.2d 371, 373–74 (1st Cir. 1987)).[11]

---

instructed you on the purposes for which the item can and cannot be used."  *Final Jury Instructions* at 3.

[11]   I previously denied Jordan and Canty's Motions for Acquittal (ECF Nos. 281, 282) under Fed. R. Crim. P. 29(a), which provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In doing so, I concluded there was sufficient evidence to convict, but I characterized the issues as presenting a "very close call."  Hr'g Tr. at 45, Feb. 14, 2020.  I have reexamined the entire trial record in connection with the Defendants' subsequent joint Motion for a New Trial.  For the reasons explained in this decision, I conclude that the evidence supporting each Defendant's guilt was substantial and largely uncontradicted, and did not present a close call as to either Defendants' guilt.

**B.      Strength of the Evidence Against the Defendants**

As explained previously, the Government's theory of the case was that Jordan, Canty, and other drug dealers conspired to sell drugs out of trap houses, which they gained access to from drug users in exchange for drugs.  The Government identified three primary trap houses, identified according to their locations: Oak Street, Redbank, and Grant Street.  The Government also maintained that the drug dealers relied on various drug-addicted individuals as gatekeepers, runners, and drivers to help facilitate transactions.  I now summarize the evidence against each defendant, beginning with Jordan.

**1.  Evidence Establishing Defendant Jordan's Guilt**

The evidence as to Jordan's guilt was extensive.   In 2015, Jordan came to Maine and met with James Osborne and his sister, Jessica Tweedie.  Jordan asked Osborne to supply him with a stream of customers to whom he could sell heroin.  As payment, Jordan provided Osborne with "free" drugs.  Jordan purchased Osborne a "trap phone," a disposable burner phone that Osborne could use to facilitate drug deals.  They used Tweedie's Redbank apartment in South Portland to bag the drugs. In the beginning, Jordan and Osborne delivered drugs to buyers on the street, with Tweedie providing transportation.  Osborne testified that from the start of his working relationship with Jordan through early 2016, using a highly conservative estimate, Jordan distributed a half gram of heroin twenty times per day through Osborne.

In late 2015, while Jordan was in New York to replenish his supply of drugs, Jordan told Osborne to meet up with another drug dealer, Lamale Lawson, to acquire drugs for Osborne's personal use.  At some point thereafter, Jordan and Lawson began using the Oak Street apartment of Lance Lombardi, a drug user, as a trap house.  Lombardi kicked out other drug dealers from the apartment, and Osborne brought Jordan and Lawson in.  Lawson operated out of the Oak Street trap first, and Jordan joined after he had been robbed; Lawson instructed Osborne to pick Jordan up from Boston and bring him to the Oak Street trap house.  Jordan and Lawson paid Lombardi with drugs in exchange for the use of his apartment. Jordan and Lawson used the Oak Street trap house for roughly six months, until Lombardi was evicted.  During that time, Osborne operated the door and acted as a drug runner for both Jordan and Lawson.

At various times, Jordan and others used Tweedie's Redbank apartment as a trap house.  While Jordan was selling heroin out of Redbank, another drug dealer, Akeem Cruz, also sold heroin out of the trap house in Jordan's presence, though Jordan and Cruz did not share customers.  Eventually, the Redbank trap house was raided, and its use as a trap house was discontinued.

After the Oak Street trap house was shut down, Jordan found the next trap house at Grant Street, which overlapped with the use of the Redbank trap house before it was raided.  Amy Santiago leased the Grant Street trap house, and she acted as a runner for Jordan and the other dealers.

The parties stipulated that Jordan left Maine in February of 2017, and the Government contended that he exited the conspiracy at that point.

In summary, the Government presented overwhelming evidence that between 2015 and 2017 Jordan was significantly involved in a conspiracy with drug dealers including Cruz, Lawson, and Canty to distribute drugs out of various trap houses in Maine with the assistance of a number of drug-addicted individuals, including Osborne, Tweedie, Lombardi, and Santiago. This evidence could have left the jury with no reasonable doubt as to Jordan's guilt.

### 2.  Evidence Establishing Defendant Canty's Guilt

As to Canty, the evidence of his involvement in selling heroin at the three trap houses during the approximately three-month period he was in Maine in 2016 was not as extensive as Jordan's because he was in Maine for a much shorter period of time. Osborne testified that he first met Canty at the Oak Street apartment while operating the door of the trap house. Canty assisted Cruz in jumping and beating up Osborne because Osborne and the trap house's tenant, Lombardi, had used drugs Cruz had given them to sell. Canty sold heroin from the Oak Street trap house at the same time that Jordan, Cruz and Lawson were selling drugs from the house. Canty also sold heroin from the Redbank and Grant Street trap houses, along with Jordan and the other dealers. Like Jordan, Canty worked closely with Osborne and provided him with drugs. Canty, along with Cruz and Jordan, slept at Tweedie's Redbank apartment, and he also stored his heroin supply there. Canty received assistance,

typically in exchange for heroin, from the same persons—including Osborne and Tweedie—who assisted Jordan, Lawson, and Cruz in the same fashion.

The Government's evidence thus demonstrated that Canty worked, to varying degrees, with the same individuals, at the same locations, in the same manner, and at the same times as Jordan and the other drug-dealing participants in the conspiracy. Although Canty's three-month involvement in the conspiracy was far shorter than Jordan's more than year-long involvement, there was ample evidence of Canty's direct and substantial involvement with the members of the conspiracy. *Cf. United States v. Nelson-Rodriguez*, 319 F.3d 12, 28 (1st Cir. 2003) ("'Mere association' with the conspirators or 'mere presence' during activities of the conspiracy will not, standing alone, be sufficient for conviction.") (quoting *United States v. Gomez-Pabon,* 911 F.2d 847, 852 (1st Cir. 1990)).

### 3. Conclusion of Evidentiary Review

For the foregoing reasons, the Government's evidence against Jordan and Canty was strong and leaves little doubt that the jury would have convicted the Defendants "absent the prosecutor's improper remarks." *Azubike*, 504 F.3d at 41; *see also Arrieta-Agressot*, 3 F.3d at 526 (vacating a conviction where the prosecutor made improper remarks to the jury and the evidence did not make conviction "inevitable"). Unlike the First Circuit's decision in *Arrieta-Agressot*, where the Court vacated a conviction and remanded for a new trial due to "the potency of the [prosecutor's] misstatements *and the presence of direct exculpatory testimony*," *id.* at 529 (emphasis added), here, there was no direct exculpatory evidence and there was no viable

alternative but for the jury to convict both Jordan and Canty.  Accordingly, I conclude that despite the severity of the prosecutor's misstatements, they did not poison the well to such a degree that "the trial's outcome was likely affected," *Belanger*, 890 F.3d at 34 (quoting *Henderson*, 320 F.3d at 107), and that the Defendants' motions for a new trial must be denied.[12]

## V.  CONCLUSION

For the preceding reasons, it is **ORDERED** that Jordan and Canty's joint Motion for New Trial/Dismiss (ECF No. 348) is **DENIED.**

**SO ORDERED.**

**Dated:  October 9, 2020**


_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**

---

[12] Jordan and Canty also ask that the indictment against them be dismissed with prejudice. ECF No. 348 at 8. I deny this relief for the same reasons I deny their motion for a new trial.